# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CHEVRON ORONITE COMPANY, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 11-0560** |
| **UNITED STEEL PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED-INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, LOCAL 13-447** | **SECTION "K"(3)** |

## ORDER AND OPINION

Before the Court are the cross motions for summary judgment filed on behalf of plaintiff Chevron Oronite Company, LLC ("Chevron") (Doc. 16) and defendant United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union, Local 13-447 ("Union") (Doc. 15). Having reviewed the pleadings, memoranda, and relevant law, the Court, for the reasons assigned, denies Chevron's motion for summary judgment and grants Union's motion for summary judgment.

### Background

Chevron employed Russell Rogers at its Oak Point Plant in Belle Chasse, Louisiana as a mechanic in the maintenance department. A collective bargaining agreement ("CBA") exists between Chevron and the Union under which Union represents a bargaining unit of maintenance and production employees at the Oak Point Plant, including Rogers.

On June 21, 2010, a crew of contractors employed by Turner Industries ("Turner") worked to unbolt and remove a pipe, estimated to weight 1,500 - 1,700 pounds from the "SAM" unit at the Oak Point Plant in order to permit the pipe to be cleaned. Rogers assisted the Turner crew by

operating a 30-ton mobile crane to lift the pipe off of the SAM unit after Turner employees completely unbolted the pipe from the SAM unit. Turner employees David Rico and Bryon Hill were working approximately twenty (20) feet above the ground, from a man-lift to unbolt the final bolts on the pipe. After Turner employees removed the final bolt, the pipe began to sway. Rico signaled Rogers to lift the pipe but received no response. Having received no response, Rico signaled a ground man concluding that because he could not see Rogers maybe Rogers could not see him. When Rogers failed to respond to Rico's signal, members of the Turner ground crew began shouting at Rogers to get his attention. They proved unable to attract Rogers's attention. Ground crew members then approached the mobile crane, looked into the cab of the crane, and saw Rogers slumped forward with his head on his chest to the right . The ground crew continued yelling at Rogers, ultimately getting his attention, at which point Rogers lifted the pipe. After completing the work, Turner employees reported the incident to a Turner manager who in turn reported it to Chevron.

Chevron's Maintenance Supervisor Lee Stewart and James Griggs, Chevron's Human Resources Business Partner investigated the incident. The investigation included obtaining two statements from each of the Turner employees who witnessed the incident, interviewing Rogers, and photographing a recreation of the incident. The Chevron Plant Management Team concluded that Rogers was inattentive and asleep while operating the crane and terminated his employment for placing workers in severe jeopardy as a result of his inattention.

After the Union grieved Rogers's discharge the matter proceeded to arbitration. The issue framed to the arbitrator was "[d]id the Company have just cause to terminate the Grievant Russell Rogers? If not, what is the appropriate remedy?" Following a hearing, the arbitrator opined:

2

## Discussion

Did the Company have just cause to terminate Russell Rogers for sleeping on the job and placing fellow workers at serious risk? To better understand the process of determining just cause for the Rogers' termination of employment, I relied on the tests of just cause as described by Koven and Smith and information from the Bureau of National Affairs.

### First Test

Was the employee adequately warned of the consequences of his conduct? There is no question that Rogers knew that sleeping on the job would result in serious consequences. The Company was clear in its communications to employees that, due to the nature of the work and process involved in the production of its products, inattentive employees could cause death or serious injuries to themselves and others.

### Second Test

Was the employer's rule or order reasonably related to efficient and safe operations? There is no question about this test, particularly with the issue related to safe operations necessary in this case. The company was not unreasonable in this rule for all employees.

### Third Test

Did management investigate before administering the discipline? The investigation of the incident was about as complete as it gets. Interviews were conducted with Rogers, coworkers, supervisors, as well as Union representatives. The site of the incident was examined from every angle, photographed and documented.

### Fourth Test

Did the investigation produce substantial evidence or proof of guilt? Rogers testified that he may have dozed off but it was only for a very short time. But the evidence from many coworkers presented by the Company was overwhelmingly credible that Rogers was "asleep at the wheel" for a long time, and that significant hollering and screaming was required to wake him. The only way a person can determine how long he slept is by timing when he went to sleep and when he awoke. . .. or being told by a person with first hand knowledge. Sleep is defined as a state of *unconsciousness.* In this

state, the brain is more responsive to *internal stimuli* than *external stimuli*.

The Union argued that the Turner Industries workers doing contract work for the Company were biased in their testimony associated with the events which led to Roger's termination of employment. A significant amount of the Company's evidence presented at the hearing was provided by the Turner employees. The Union suggested that evidence presented by Turner workers cannot be trusted. At issue is whether there was animosity between contract workers and union workers at the Company.

The Turner workers resisted appearing at the arbitration hearing. Several of them were subpoenaed to appear - they weren't happy about testifying. One in particular was upset that he had been "commanded" to be at the hearing. Clearly the Turner workers did not like the idea of being part of a termination of another worker, union worker or not. Often times, there are issues inherent in a company where union workers comingle [sic] contract workers. Many union workers believe that contract workers take work that would otherwise belong to union workers. However, there was no evidence that the contract workers were out to harm Rogers.

Fifth Test

Were the rules, orders, and penalties applied evenhandedly and without discrimination? There was no compelling evidence that the Company had been lax in its position regarding unsafe practices and sleeping on the job.

Sixth Test

Was the penalty reasonably related to the seriousness of the offense and the past record? The Company's decision to terminate Rogers employment was excessive.

Rogers put himself and others in serious jeopardy. It was either luck or Providence that no one was killed or injured. The Company came down hard on Rogers. But, too hard it seems to me. A month off without pay with stipulations once he returned would be more reasonable.

Decision

> Rogers will be reinstated. The termination will be reduced to 4-week suspension without pay. His benefit package will be reinstated retroactively. The Company will pay Rogers back pay at his regular rate exclusive of any missed overtime, holiday, shift differential, or other monetary considerations.
>
> At the Company's option, Rogers may be evaluated by a Company designated physician to determine if his propensity for falling asleep at work is evidence of a health issue.

Doc. 16-11, p.11 - 13 (footnote and citation omitted).

Thereafter Chevron filed suit seeking to vacate the arbitrator's award on the basis that the award failed to draw its essence from the CBA.

## Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Stults v. Conoco*, 76 F.3d 651 (5th Cir.1996), citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 912-13 (5th Cir.), quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). When the moving party has carried its burden under Rule 56, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir.1995).

"A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007) quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment evidence must be "viewed in the light most favorable to the nonmovant, with all factual inferences made in the nonmovant's favor." *Bazan ex rel Bazan v. Hildago County*, 246 F.3d 481, 489 (5th Cir. 2001), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513.

Law and Analysis

It is axiomatic that judicial review of an arbitrator's award is "extremely limited." *American Eagle Airlines v. Air Line Pilots Ass'n*, 343 F.3d 401, 405 (5th Cir. 2003). "As long as the arbitrator's decision 'draws its essence from the collective bargaining agreement' and the arbitrator is not fashioning 'his own brand of industrial justice,' the award cannot be set aside." *Weber Aircraft, Inc. v. General Warehousemen and Helpers Union Local 767*, 253 F.3d 821, 824 (5th Cir. 2001) quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 S.Ct. 286 (1987). To determine whether the arbitrator's decision "draws its essence from the collective bargaining agreement," the Court must first examine the terms of the CBA.

Article XVII of the CBA entitled "Safety and Health" provides in relevant part that "[e]mployees are required to comply with all safety policies as established by the Company . . .." Doc. 15-3, Ex. 1. Additionally, Article XX - Management Rights provides in pertinent part that the Chevron "reserves and retains all rights . . . to establish and enforce work rules." Doc. 15-3, Ex. 1.

Additionally, Chevron has promulgated the "General Instructions for Employees" (GIE)

which includes a statement that "[w]orking safely is a condition of employment at the Oak Point Plant and also states under the "General Plant Rules" that "[f]ailure to follow these rules can result in disciplinary action which may include termination." Doc. 15-5, p. 5. Under "Personal Safety" the GIE states "[d]isregarding safety instructions or violating safe practices can lead to disciplinary action, including discharge."

Considering the specific provisions of the CBA, the Court concludes that the arbitrator's decision draws its essence from the CBA. Although the CBA sets forth the "Arbitration Procedure" to be used when a grievance cannot be resolved through other means set out in the CBA, no provision of the CBA either defines "just cause" or limits the arbitrator's authority to review or modify the penalty imposed on an employee. The significance of the absence of such provisions cannot be overstated. Nothing in the CBA mandates termination for the violation of a safety rule. Moreover, even assuming without deciding that the Management Rights article of the CBA grants the provisions of the GIE the force of contract, nothing in the rules of the GIE mandates termination for the breach of a safety rule. Although the GIE notes in Section 2.1 entitled "Responsibilities" that "[w]orking safely is a condition of employment at the Oak Point Plant" and that "[e]ach employee will be held accountable for his or her own safety performance," the rules also state that a failure to follow the rules "*may* include termination." (emphasis added). The use of the permissive "may" indicates that sanctions less than termination are contemplated and permissible under the GIE. Therefore, the arbitrator's remedy of a sanction less than discharge for a safety violation can reasonably be construed as drawing its essence from the CBA.

Relying on *E.L. DuPont de Nemours and Company v. Local 900 of the International Chemical Workers Union, AFL-CIO*, 968 F.2d 456 (5th Cir. 1992) and *Delta Queen Steamboat Co.*

7

*v. Dist. 2 Marine Engineers Beneficial Ass'n, AFL-CIO,* 889 F.2d 599 (5th Cir. 1989) Chevron urges that the arbitrator's findings of fact constitute an implicit finding of just cause for discharge and that considering that implicit finding of just cause, the arbitrator exceeded his authority by fashioning a different remedy for Rogers' carelessness on the job. The Court acknowledges that *DuPont* and *Delta Queen* permit an implicit finding of just cause, but concludes that those cases are inapplicable. As previously noted, in assessing whether Chevron had just cause to terminate Rogers, the arbitrator applied the analysis of just cause set forth in Just Cause: The Seven Steps, Adolph M. Koven and Susan L. Smith (BNA). Under that analytical model, a factual finding of just cause is not made independently of an overall determination of just cause. Rather, in the Koven and Smith approach, the determination of whether the "degree of discipline administered by the Employer in a particular case [is] reasonably related to (a) the seriousness of the employees *proven* offense, and (b) the record of the employee in his service with the employer" is an integral component of the just cause analysis. Given the specific approach used by the arbitrator, it is not reasonable to conclude that there was an implied finding of just cause, as there was in *DuPont* and *Delta Queen,* and that the arbitrator exceeded his authority by modifying the remedy imposed by Chevron. The arbitrator concluded that Rogers "put himself and others in serious jeopardy" which constitutes an implicit finding that he violated a safety rule. However, because nothing in the CBA or the GIE mandates that the failure to comply with a safety rule constitutes "just cause" for termination or mandates termination of employment, the arbitrator did not exceed his authority in concluding that there was not just cause for termination of Rogers.

Chevron also asserts that the arbitrator exceeded his authority because the remedy of reinstatement violates . . . the issue stipulated by the parties, which authorized the Arbitrator to

fashion a remedy **only if** he failed to find just cause for Rogers' [sic] termination." Doc. 16-1, p.2. The parties stipulated the issue to be determined by the arbitrator as "[w]as the grievant, Russell Rogers terminated for just cause? If not what is the appropriate remedy." Doc. 15-2, p. 5, No. 27, Doc. 19-1, p. 5-6, No. 18. The arbitrator concluded that there was not just cause for Rogers's termination. Having concluded that there was not just cause for the termination, the arbitrator was authorized to determine the appropriate remedy. For the reasons stated herein above, a remedy less than discharge did not exceed the arbitrator's authority. Accordingly,

**IT IS ORDERED** that the "Motion for Summary Judgment" filed on behalf of behalf of plaintiff Chevron Oronite Company, LLC ("Chevron") (Doc. 16) is **DENIED;** and

**IT IS FURTHER ORDERED** that the "Motion for Summary Judgment" filed on and defendant United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union, Local 13-447 ("Union") (Doc. 15) is **GRANTED**.

New Orleans, Louisiana, this 27th day of August, 2012.

STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT JUDGE